IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBORAH A. ALEXANDER,                           Case No. 6:15-cv-01960-SB

      Plaintiff,                                    **FINDINGS AND
                                                RECOMMENDATION**

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____

**BECKERMAN, Magistrate Judge.**

      Deborah Alexander ("Alexander") brings this appeal challenging the Commissioner of

Social Security's ("Commissioner") denial of her applications for Social Security disability

insurance benefits and Supplemental Security Income under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the Commissioner's

decision should be reversed and remanded for an award of benefits.

## BACKGROUND

      Alexander stands four feet, nine inches tall and her weight fluctuates between 145 and

165 pounds. She was born in September 1964, making her forty-seven years old on October 1,

PAGE 1 – FINDINGS AND RECOMMENDATION

2011, the amended alleged disability onset date. Alexander is a high school graduate, and her past work includes time as a vault teller and casino cashier. She alleges disability due primarily to cognitive and cancer-related impairments and a hernia.

On October 25, 2011, Alexander presented for a follow-up visit with Dr. Keith Harris ("Dr. Harris"). In his treatment notes, Dr. Harris observed that Alexander was having recurrent abdominal pain and complained of nausea, and that she had "previous attacks of pancreatitis" and underwent an endoscopic retrograde cholangiopancreatography ("ERCP") "with stone removal and then subsequently underwent a lap discomfort cholecystectomy."[1] (Tr. 456.) After discussing the relevant risks and benefits with Alexander, Dr. Harris scheduled an upper endoscopy and routine laboratory data.

On January 17, 2012, Alexander met with Dr. Eric Soder ("Dr. Soder") regarding a recent diagnosis of cancer found in her left breast. Dr. Soder noted that Alexander elected to proceed with a mastectomy, and recommended that Alexander repair an umbilical hernia that was causing nausea. (Tr. 420.)

Alexander underwent a mastectomy on January 30, 2012, and was seen for follow-up care with Dr. Michael Brown ("Dr. Brown") on February 9, 2012. Dr. Brown, who referred to Alexander as "developmentally disabled," discussed chemotherapy and radiation treatment with Alexander and her family members who were present, as well as hormonal suppression therapy and a lymphedema program intended to help alleviate edema or decreased range of motion. (Tr. 1439; *see also* Tr. 1418, 1436.)

---

[1] "An ERCP involves inserting a scope into the duodenum via the esophagus. A small catheter is then inserted into the common bile duct." *Poche v. Joubran*, 389 F. App'x 768, 770 n.2 (10th Cir. 2010). A cholecystectomy is the surgical removal of the gallbladder. *Willis v. Bender*, 596 F.3d 1244, 1246 (10th Cir. 2010).

PAGE 2 – FINDINGS AND RECOMMENDATION

On February 15, 2012, Alexander and several family members visited Dr. Stephen Williams ("Dr. Williams"), an oncologist at Roseburg Medical Oncology. In his treatment records, Dr. Williams referred to Alexander as a "developmentally disabled" woman, and noted that Alexander was recovering well from surgery and had no complaints that day. (Tr. 1807.) Dr. Williams also noted that Alexander had an "exceedingly high" risk of relapse, and observed that Alexander's "limited cognitive ability will complicate her therapy but she has excellent family support." (Tr. 1809.)

On March 24, 2012, Alexander's sister, Amy Kincaid ("Kincaid"), a manager and former counselor for the Oregon Office of Vocational Rehabilitation Services, completed a third-party adult function report. Kincaid stated that Alexander recently underwent a mastectomy and had lymph nodes removed, which impacts her ability to use her left arm; undergoes radiation and chemotherapy; suffers from depression, anxiety, severe nausea, and fatigue due to chemotherapy treatment and medication side effects; masks the degree of her impairment; was "held back" in kindergarten and "always had difficulty in school"; needs reminders regarding medical appointments and personal care because she "often gets confused"; lives with their elderly father, who "pushes her to take care" of dishes and laundry that "piles up" at their residence; and has "very serious issues" with memory, comprehension, and the ability to complete tasks and maintain concentration. (Tr. 269, 272, 275.) Kincaid added that she "feel[s] strongly" that Alexander is a "good candidate for social security," that "there is no possibility of her functioning in a work setting" post-cancer diagnosis, and that "her physical and mental abilities are so limited she is unable to take care of herself, keep track of medical appointments or medications," or complete routine activities of daily living "without reminders or assistance." (Tr. 278.)

The following day, March 25, 2012, Kincaid completed a work history report on Alexander's behalf. In the report, Kincaid indicated that Alexander last worked in 2008, her employment history consists of short-term jobs, and "[m]ost job loss has been a result of difficulty learning tasks fast enough and accepting feedback or constructive criticism without becoming extremely emotional." (Tr. 291.)

On April 24, 2012, Alexander presented for a follow-up visit with Dr. Fred Black ("Dr. Black"), complaining of pain throughout her body, including her bones, lower back, legs, and spine, as a result of chemotherapy treatment. (Tr. 1338-39.) Dr. Black provided Alexander with pain and sleep medications. The following week, Alexander and her sister visited Dr. Soder. Alexander, who was tearful, asked Dr. Soder for Vicodin because she was experiencing "vague pain in her legs and back." (Tr. 1489.)

In a treatment note dated May 9, 2012, Dr. Williams noted that Alexander had been tolerating therapy "poorly" and frequently called the office "in tears requesting additional pain medications." (Tr. 1791.)

On June 29, 2012, Dr. Leslie Arnold ("Dr. Arnold"), a non-examining state agency medical doctor, completed a physical residual functional capacity assessment. Based on a review of the records, Dr. Arnold concluded that Alexander could lift and carry twenty pounds occasionally and ten pounds frequently; stand, sit, and walk up to six hours during an eight-hour workday; push or pull in accordance with her ability to lift and carry; occasionally stoop; and frequently balance, kneel, crouch, crawl, and climb ladders, ropes, scaffolds, and ramps and stairs. Dr. Arnold also concluded that Alexander does not suffer from any manipulative, visual, communicative, or environmental limitations.

PAGE 4 – FINDINGS AND RECOMMENDATION

Also on June 29, 2012, Dr. Barney Greenspan ("Dr. Greenspan"), a non-examining state agency psychologist, reviewed the record and completed a psychiatric review technique assessment. Dr. Greenspan found that the limitations imposed by Alexander's impairments failed to satisfy Listing 12.04 (affective disorders).[2]

In a treatment note dated July 17, 2012, Dr. Brown noted that Alexander was tolerating chemotherapy treatment well and did not complain of chest pain or tenderness, but did continue to experience issues with nausea and an umbilical hernia that was being followed by Dr. Soder. (Tr. 1432.) Later that month, after completing her eleventh treatment, Alexander informed Dr. Brown that she was experiencing "pretty bad" headaches on a daily basis, difficulty sleeping, and anxiety. (Tr. 1430.) The following week, Alexander reported experiencing stiffness in her left shoulder, but denied "any increase in fatigue" and did not complain about any swelling in her hand or arm. (Tr. 1428.)

In a treatment note dated September 17, 2012, Dr. Soder noted that Alexander was having difficulty with pain and had recently completed radiation therapy. (Tr. 1483.) Later that month, Dr. Soder noted that Alexander again needed pain medication because she continued to experience pain and discomfort. (Tr. 1481.) Around that same time, Alexander reported that she was experiencing "increasing discomfort and pain" related to the hernia that Dr. Soder recommended be repaired.[3] (Tr. 1486.)

---

[2] The Listing of Impairments is found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

[3] Alexander, her primary care physician, and a surgeon "petitioned the Oregon Health Plan for coverage of the periumbilical hernia repair, and this was refused." (Tr. 484.) Alexander's hernia "has never been repaired, and it remains symptomatic." (Pl.'s Br. at 4 n.3; *see also* Tr. 1757, 1771, 1859.)

PAGE 5 – FINDINGS AND RECOMMENDATION

Alexander returned to Dr. Harris' office on November 6, 2012, complaining of abdominal pain, nausea, and vomiting. Dr. Harris noted that, in the process of being treated for breast cancer, Alexander developed "anorexia abdominal pain and associated nausea," and sustained a weight loss of approximately twenty-three pounds over the course of the preceding six to eight months. (Tr. 1676.)

On November 9, 2012, at the request of her two sisters, Alexander presented for a mental health assessment at Douglas County Health and Social Services Department. Alexander reported that, after being diagnosed with cancer, she engages in isolating behavior and experiences depression on "most days," panic attacks multiple times a week, anxiety, low energy, loss of interest, feelings of hopelessness, and changes in her sleep and appetite. (Tr. 1679, 1688.) Alexander added that her depression and anxiety have "been steadily increasing" post-cancer diagnosis. (Tr. 1679.) Jennie Sedlacek ("Sedlacek"), a medical student, assigned a Global Assessment of Functioning ("GAF") score of fifty-five, referred Alexander to individual and group therapy, and scheduled a therapy session.[4]

Later that month, Alexander attended a therapy session with Vickie Roner ("Roner"), a licensed clinical psychologist. Alexander reported "spending a great deal of her day worrying that her cancer will come back and that she will die." (Tr. 1691.) Roner noted that she wanted Alexander to participate in a cancer support group, and to "develop skills to help her cope with

---

[4] A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. *Vargas v. Lambert*, 159 F.3d 1161, 1172 n.2 (9th Cir. 1998) (citation omitted). A GAF score of fifty-five indicates at least moderate symptoms or moderate difficulty in social, occupational, or social functioning. *Id.*

PAGE 6 – FINDINGS AND RECOMMENDATION

her diagnosis of cancer and to grieve the los[s] of her breast[.]" (Tr. 1691.) Roner assigned a

GAF score of sixty-six.[5]

    In a third-party adult function report dated December 1, 2012, Kincaid indicated that she

"believe[s]" Alexander suffers from a cognitive problem, such as a low intelligent quotient

("IQ") or other "significant issue." (Tr. 301.) Kincaid added that although Alexander "has always

ha[d] disabling" cognitive issues, Alexander's cognitive issues "have developed [and] are

significantly worse" due to her cancer diagnosis and treatment regimen, and Alexander needs a

neuropsychological evaluation to determine the severity of her memory, concentration, and IQ

deficits. (Tr. 304-07.) Kincaid stated that her professional experience as a vocational

rehabilitation counselor led her to conclude that Alexander is unemployable. (Tr. 307.)

    On December 20, 2012, Alexander presented for a follow-up visit with Dr. Williams,

who observed that Alexander's "risk of relapse without additional adjuvant therapy is

exceedingly high and her adjuvant therapy will include chemotherapy, radiotherapy, and

hormonal suppression." (Tr. 1701, 1703.)

    On January 8, 2013, Alexander presented for a follow-up visit with Dr. Heidi Beery ("Dr.

Beery"). Alexander reported that she continued to "really struggle with anxiety about [her]

cancer returning," that she has not "noticed much of a difference" taking anxiety medication, and

that she was experiencing a constant throbbing pain under her left arm that was "radiating

towards her mid chest." (Tr. 1721.) Dr. Beery observed that Alexander appeared "to have

developed a chronic pain syndrome in her axilla possibly from scar tissue or damage to the

nerves from [her mastectomy] or radiation and it is causing increasing muscle pain in the

---

    [5] "A GAF between sixty-one and seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but 'generally functioning pretty well' with some meaningful interpersonal relationships." *Hall v. Astrue*, No. 10-118, 2011 WL 3555716, at *3 n.5 (E.D. Cal. Aug. 11, 2011).

shoulder area," and that Alexander "is at risk of developing a frozen shoulder if she does not improve [range of motion] in her shoulder." (Tr. 1724.)

On January 11, 2013, Dr. Neal Berner ("Dr. Berner"), a non-examining state agency medical doctor, reviewed the medical records and adopted Dr. Arnold's physical residual functional capacity assessment.

On January 15, 2013, Dr. Dorothy Anderson ("Dr. Anderson"), a non-examining state agency psychologist, reviewed the record and adopted Dr. Greenspan's conclusion that Alexander did not satisfy Listing 12.04.

In a treatment note dated March 21, 2013, Dr. Williams noted that Alexander had completed adjuvant radiation therapy, started hormonal suppression in September 2012, and was "tolerating therapy well and will continue long term." (Tr. 1699.) Alexander was instructed to follow up in three months. Later that month, Alexander was seen by Scott Moore ("Moore"), a physician's assistant, and reported experiencing "continued discomfort in the left lateral chest wall," and a decreased range of motion in her left shoulder. (Tr. 1704.) Alexander declined a referral to physical therapy for an evaluation.

In a treatment note dated April 10, 2013, Dr. Beery noted that Alexander's fatigue had not improved, "[j]ust cleaning the house yesterday made her dead," and that Dr. Scott Segal ("Dr. Segal") felt that Alexander's pain was "probably . . . not going to change." (Tr. 1713.) Dr. Beery added that Alexander was taking three Percocet per day and it was "working well," Cymbalta had helped Alexander's mood, and Alexander was attending therapy sessions with Roner and "going to meetings at the cancer treatment center." (Tr. 1713.)

During a consultation on May 2, 2013, Dr. Soder noted that Alexander had developed an incisional hernia at the umbilicus after undergoing a laparoscopic cholecystectomy, and the

hernia was "becoming more symptomatic and [it] does require reduction more frequently and is painful." (Tr. 1757.) Later that month, Alexander visited the emergency room, complaining of hernia pain. (Tr. 1771.)

Alexander visited Dr. Soder on May 23, 2013, complaining of hernia-related abdominal pain and associated nausea. Dr. Soder noted that Alexander's "ventral incisional hernia is enlarging, tender, located mostly at and above the umbilicus," and he continued to recommend a hernia repair. (Tr. 1861.)

Alexander presented for an individual therapy session with Roner on June 17, 2013. Roner noted that Alexander attended the meeting with her sister, reported that her mood was good and she was taking care of the cooking, cleaning, and her dad, attending the cancer support group once a month, and was "cancer free," and "denied spending a great deal of the time worrying about cancer returning." (Tr. 1761.) Alexander also verbalized "comfort with her case being closed at [that] time." (Tr. 1761.)

Alexander discovered a new mass in her right breast in October 2013, but test results were normal. (Tr. 1923.)

On October 21, 2013, Alexander was referred to Dr. Wayne Taubenfeld ("Dr. Taubenfeld") for a learning disability and psychological assessment. Dr. Taubenfeld interviewed Alexander and Kincaid, and administered, *inter alia*, the Wechsler Adult Intelligence Scale, Fourth Edition, battery of tests. Dr. Taubenfeld's report indicates that Alexander obtained a full-scale IQ score of sixty-six, a verbal comprehension score of seventy, a perceptual reasoning score of seventy-three, a processing speed score of seventy-four, and a working memory score of sixty-nine. Dr. Taubenfeld noted that Alexander's full-scale IQ score placed "her overall level of cognitive functioning in the Extremely Low range (1st percentile)," and that "the results obtained

are considered to be a valid representation of her cognitive functioning and academic achievement." (Tr. 1888.) Dr. Taubenfeld also assigned Alexander a GAF score of forty-three,[6] found Alexander's memory scores "about the same as those on general intellectual functioning tests," and concluded that Alexander suffers moderate levels of depression, "extreme levels of anxiety," a dependent personality disorder, cognitive deficits that would impair her work quality or productivity, "significant impairment in attention/concentration," "significant deficits in sequencing tasks and frontal lobe functioning," and "significant deficits in executive functioning that would impede [her] decision making ability." (Tr. 1891-92, 1894, 1897, 1899.)

In a letter to the referring agency that was attached to his evaluation, Dr. Taubenfeld stated that Alexander was a "good candidate for DD or SSI services," while noting that Alexander displays "poor intellectual functioning which is exemplified with her extremely low IQ" and a memory that "seems to mirror IQ," none of Alexander's "intellectual functioning skills are strong," and testing demonstrated that Alexander "is unable to perform many basic tasks" and has learning difficulties. (Tr. 1900.)

On November 13, 2013, Dr. Taubenfeld completed a Mental Residual Functional Capacity Assessment, wherein he opined that Alexander suffers from a Category IV level of impairment (i.e., performance precluded for fifteen percent or more of a workday) in seven of twenty categories of mental activity.

On December 9, 2013, Alexander visited Moore at the Community Cancer Center. Moore noted that Alexander denied any increasing chest wall pain, but reported developing "increased

---

[6] A GAF score of forty-one to fifty "indicates [s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Holcomb v. Astrue*, 389 F. App'x 757, 759 n.1 (10th Cir. 2010) (citation omitted). Heidi Watson, a licensed clinical psychologist at the Douglas County Mental Health Division, similarly approved a GAF score of forty-eight, after Alexander presented for a mental health assessment on March 24, 2014. (Tr. 1958-59.)

numbness and diminished strength in the left arm over the last month," as well as "continued reduced range of motion of the left shoulder for which she has been offered physical therapy by her primary care physician as well as from our office in the past, and she has been resistant to pursue this." (Tr. 1918.)

In a questionnaire dated April 11, 2014, Alexander's treating physician, Dr. Beery, stated that (1) she agreed with the findings in Dr. Taubenfeld's psychological evaluation and Mental Residual Function Capacity Assessment; (2) Dr. Taubenfeld's assessment of Alexander's mental function was consistent with her own interactions with Alexander; (3) Alexander suffers from chronic pain due to nerve damage "from her surgery for breast cancer which limits her ability to use her left arm"; (4) it "would be extremely challenging" for Alexander "to ever find a job that would accommodate both her mental [and] physical limitations"; and (5) Alexander would be unable to sustain a regular work schedule more than four days per month as a result of her medically determinable impairments. (Tr. 1962.)

In a letter dated April 18, 2014, Alexander's other sister, Lea Schuster ("Schuster"), reported that Alexander was always considered "a slow learner," "consistently struggled in school," received a diploma due to good high school attendance, was admitted to college because she "only needed a diploma," flunked out of college, and has significant difficulties completing normal activities of daily living and "simple tasks" due to memory, cognitive, and cancer treatment-related impairments. (Tr. 355-56.)

An administrative law judge ("ALJ") convened a hearing on April 16, 2014. The ALJ posed questions to a vocational expert ("VE") who testified at Alexander's hearing. The ALJ first asked the VE to assume that a hypothetical worker of Alexander's age, education, and work experience could perform light exertion work, but was limited to: (1) no more than frequent

crawling, crouching, kneeling, climbing, and balancing; (2) no more than occasional stooping, reaching with the left upper extremity, and interaction with co-workers and the general public; and (3) simple, repetitive, routine tasks. The VE testified that the hypothetical worker could not perform Alexander's past relevant work as a casino cashier and vault teller, but could be employed as a security guard, meter reader, and escort vehicle driver. The VE also testified that there were 300,000 security guard jobs, 40,000 meter reader jobs, and 50,000 escort vehicle driver jobs available in the national economy.

Responding to the ALJ's remaining questions regarding customary tolerances, the VE testified that employers expect tardiness to be "kept to an absolute minimum," would not tolerate more than one unexcused absence per month "on a regular, ongoing basis," provide two ten to fifteen-minute breaks and a thirty to sixty-minute lunch, and allow employees to be off-task up to ten percent of the workday. (Tr. 94-95.)

Alexander's attorney also posed a series of questions to the VE, nearly all of which tracked the limitations identified in Dr. Taubenfeld's November 13, 2013, Mental Residual Functional Capacity Assessment. (*Compare* Tr. 96-99, *with* Tr. 1902-06.) Alexander's attorney's questioning prompted the ALJ to concede that Dr. Taubenfeld's opinion "supports a finding of disability." (Tr. 99.) Responding to Alexander's attorney's final question, the VE testified that a hypothetical worker could not be employed as a meter reader or escort vehicle driver if she lacked the ability to use her non-dominant arm up to sixty percent of the workweek, because the positions involve driving a vehicle. The VE added that the security guard job requires only that the worker briefly document events in a chart, and that the ability to complete such paperwork was necessary to hold down the position.

In a written decision issued on May 29, 2014, the ALJ applied the five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Alexander was not disabled. *See infra*. The Social Security Administration Appeals Council denied Alexander's petition for review, making the ALJ's decision the Commissioner's final decision.[7] Alexander timely appealed.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

---

[7] As discussed more fully below, Dr. Taubenfeld issued a response to the notice of decision, at the request of Alexander's counsel, on January 28, 2015. (Tr. 1966-71; *see also* Ct. Tr. Index at 4.)

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

At the first step of the process, the ALJ found that Alexander had not engaged in substantial gainful activity since October 1, 2011, the amended alleged disability onset date. At step two, the ALJ found that Alexander had the severe impairments of "status post breast cancer with mastectomy and chemotherapy, history of irritable bowel syndrome and a hernia, obesity, depression, and anxiety." (Tr. 14.)

At the third step, the ALJ found that Alexander's combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Alexander's residual functional capacity ("RFC"), and concluded that Alexander could: (1) lift and carry twenty pounds occasionally and ten pounds frequently; (2) stand, sit, and walk up to two six hours during an eight-hour workday; (3) occasionally stoop and reach overhead with her left arm; (4) crawl, crouch, kneel, balance, and climb on no more than a frequent basis; and (5) perform only "simple, repetitive, routine tasks requiring no more than occasional interaction with co-workers and the general public." (Tr. 18.)

At the fourth step of the sequential evaluation process, the ALJ found that Alexander was not capable of performing any past relevant work. At the fifth step of the sequential process, the ALJ concluded that there were other jobs existing in significant numbers in the national economy that Alexander could perform, such as a security guard, meter reader, and escort vehicle driver.

Accordingly, the ALJ found that Alexander was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

## I.    LISTING 12.05C (INTELLECTUAL DISABILITY)

Alexander first argues that the ALJ erred at step three by failing to consider whether she meets or equals Listing 12.05C. (Pl.'s Br. at 20.) The Commissioner acknowledges that the ALJ did not evaluate the extent of Alexander's cognitive and intellectual impairments under Listing 12.05C, that the case should be remanded, and that the ALJ should evaluate on remand whether

Alexander has established equivalence. (Def.'s Br. at 4, 11.) In light of the Commissioner's concession, the Court concludes that the ALJ committed harmful error at step three, by failing to address Alexander's impairments under Listing 12.05C.

## II.    MEDICAL OPINION EVIDENCE

Although the parties agree that the ALJ erred and the case should be remanded, the Court must also examine the ALJ's analysis of the medical opinion evidence, because whether the ALJ improperly rejected the medical opinion evidence is relevant to the question of whether the Court should remand this case for further proceedings, or for benefits.

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). "An ALJ may only reject a treating physician's contradicted opinions by providing specific and legitimate reasons that are supported by substantial evidence." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citation and quotation marks omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a

medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id*. at 1012-13 (citation omitted).

### B.    Application of Law to Fact

Alexander argues that a remand for benefits is appropriate because Dr. Taubenfeld's opinion evidence, if credited as true, would support a finding of disability. (Pl.'s Br. at 26.) In response, the Commissioner acknowledges that "portions of the ALJ's analysis" regarding Dr. Taubenfeld's opinion evidence need "to be reconsidered on remand," but maintains that "the ALJ's reasoning does show the conflicts in the record and why the Court should not credit [that] evidence 'as true.'" (Def.'s Br. at 9.)

In arguing that conflicts in the record preclude the Court from crediting Dr. Taubenfeld's opinion as true, the Commissioner points to the ALJ's rejection of Dr. Taubenfeld's assessment of mild intellectual disability, the ALJ's observation that Alexander "responded well" to mental health treatment after being evaluated by Dr. Taubenfeld, and the ALJ's finding that Dr. Taubenfeld's opinion is inconsistent with the record. (Def.'s Br. at 9.) Upon review, the Court concludes that none of these findings are supported by substantial evidence in the record.

First, the ALJ rejected Dr. Taubenfeld's assessment of mild intellectual disability, noting that Alexander "reported that she had no learning disabilities in school, she was not enrolled in any special education classes, and she earned a high school diploma, even continuing on to some college courses." (Tr. 21.) The following record evidence contradicts the ALJ's findings: (1) "[a] learning disability is not . . . the same as intellectual functioning," (2) "most people with Extremely Low IQs are not assessed for learning disorders at all," (3) it "is not unusual for persons who have been considered mentally" disabled to receive a high school diploma, (4)

PAGE 17 – FINDINGS AND RECOMMENDATION

Alexander "flunked out" of college, (5) Alexander "had to repeat kindergarten," (6) around the
time Alexander started school, "many children were not placed in special education classes"
because many districts, especially in "small or rural areas" such as where Alexander grew up, did
not offer such classes, (7) Individualized Educational Programs "were not implemented until
1975, when [Alexander] would have already been in the [fifth] grade," (8) Alexander's treating
providers continually refer to her as a "developmentally disabled" woman, and questioned
whether her "limited cognitive ability" would complicate her treatment for breast cancer, (9)
Alexander received a full-scale IQ score of sixty-six, (10) Alexander's treating physician, Dr.
Beery, concluded that Dr. Taubenfeld's assessment of Alexander's "mental function" was
consistent with her own interactions with Alexander, (11) Dr. Taubenfeld is the only doctor on
record who administered the Wechsler Adult Intelligence Scale, Fourth Edition, battery of tests,
"the most commonly used objective test of intellectual functioning" in the United States, and
(12) Alexander's sister, Kincaid, a manager and former counselor for the Oregon Office of
Vocational Rehabilitation Services, opined that Alexander suffered from cognitive deficits
before Dr. Taubenfeld conducted his neuropsychological evaluation. (Tr. 68-69, 269, 301, 308,
355, 1418, 1809, 1888, 1961, 1966, 1968.) Accordingly, the ALJ's rejection of Dr. Taubenfeld's
assessment of mild intellectual disability is not supported by substantial evidence.

     Second, the fact that Alexander responded well to mental health treatment after being
evaluated by Dr. Taubenfeld is not a legally sufficient reason for rejecting his opinion. In a letter
that was provided to the Appeals Council, Dr. Taubenfeld explained that he "had hoped"
Alexander would undergo counseling and respond well, but "no matter how much counseling
[Alexander receives], her intellectual functioning will not change." (Tr. 1970.) In other words,
Dr. Taubenfeld's assessment of Alexander's mental abilities, which the ALJ conceded would

support a finding of disability, is not undermined by reports of mental health-related improvement. Indeed, Dr. Taubenfeld reiterates that, given Alexander's "poor adaptive skills, along with her age, physical condition, and poor intellectual functioning, she is not a good candidate for employment." (Tr. 1970.) Furthermore, no medical doctor has opined, based on a full review of all relevant records, that Alexander is capable of working.[8] *See Garrison*, 759 F.3d at 1017-18 (explaining that reports of improvement in the context of mental health issues "must be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace," and "[c]aution in making such an inference is especially appropriate when no doctor or other medical expert has opined, on the basis of a full review of all relevant records, that a mental health patient is capable of working or is prepared to return to work").

Finally, substantial evidence does not support the ALJ's finding that Dr. Taubenfeld's opinion is inconsistent with the longitudinal record, including Alexander's daily activities and employment history. In regard to employment history, the record indicates that Alexander has not worked since the alleged disability onset date, that Alexander's past relevant work experience comprises approximately two out of the last fifteen years,[9] that Dr. Taubenfeld was aware of Alexander's employment history, and that since 1998, Alexander has earned an annual

---

[8] Like Dr. Taubenfeld's medical opinion evidence, the mental health records cited by the ALJ (Exhibit 24F, Tr. 1855-56) appear to postdate the opinions of the non-examining state agency medical consultants.

[9] "Past relevant work is work that [the claimant has] done within the past [fifteen] years, that was substantial gainful activity, and that lasted long enough for [them] to learn to do it." 20 C.F.R. § 416.960(b)(1). "Substantial gainful activity is work activity done for pay or profit that involves doing significant physical or mental activities, taking into account the nature of the work, how well it is performed, whether it is performed under special conditions, self-employment, and time spent working." *Yarrito v. Astrue*, No. 09–cv–1952, 2010 WL 5348737, at *4 n.2 (C.D. Cal. Dec. 21, 2010).

income greater than $10,000 on only one occasion ($11,037.51 in 2002). (Tr. 14, 22, 235, 279, 291, 1968.) The record also indicates that Alexander's difficulty sustaining gainful employment is largely due to her inability to learn tasks fast enough, understand directions, and respond appropriately to constructive criticism. (Tr. 57, 72-73, 291, 306.) Alexander has also been fired or laid off "because she gives a better impression and then cannot live up to the needs of the employer." (Tr. 275.) Upon review, the Court concludes that Alexander's limited employment history during the last fifteen years supports Dr. Taubenfeld's opinion that Alexander's mental abilities would prevent her from sustaining gainful employment.

The ALJ's reliance on Alexander's daily activities is no more persuasive. In his written decision, the ALJ suggests that Dr. Taubenfeld's opinion was undermined by Alexander's ability to attend doctor appointments, complete household chores, go shopping, care for her cat, attend her nephew's baseball games, obtain a license, prepare meals, do her sister's laundry, socialize with her family, handle money, and apply for food stamps. (*Compare* Tr. 19-20, *with* Tr. 21.) The record, however, indicates that Alexander has never lived independently, is not able to manage money, has never had a long-term personal relationship, failed her driver's test multiple times in two states, requires her father to cook most of their meals, wipes off the counters and floors but otherwise lives in an "extremely filthy" household, moves her sister's laundry from the washer to the dryer using her non-dominant arm, has not attended any sporting events "for quite some time," goes "shopping primarily with [her] dad," nearly always has "somebody in the family" accompany her to doctor appointments, and has significant difficulties completing activities of daily living and "simple tasks" due to memory, cognitive, and cancer treatment-related impairments. (Tr. 69-75, 79, 304, 355-56, 1971.) When considered in their proper context, Alexander's limited daily activities are consistent with Dr. Taubenfeld's opinion. *See*

*Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (explaining that a claimant "not need to be 'utterly incapacitated' in order to be disabled") (citation omitted).[10]

In sum, the Court finds that the ALJ's reasons for discrediting Dr. Taubenfeld's opinion are not supported by substantial evidence in the record.

## III.    REMAND

### A.    The Credit-as-True Rule Generally

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). However, in a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met. *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, a district court should reverse and remand for an award of benefits when the following "credit-as-true" criteria are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

---

[10] The Court also concludes that the ALJ erred in relying on Alexander's own self-reports to deny her applications for Social Security benefits. The record is clear that Alexander suffers from significant cognitive deficits and "severely lacks insight into her own issues," and thus "is a very poor historian" and "not a good resource regarding information about herself." (Tr. 70, 77-78, 1885, 1900, 1971) In the light of the other errors discussed herein, the Court further notes that the ALJ's adverse credibility determination and rejection of lay witness testimony are not supported by substantial evidence. (*See* Tr. 19-20, 22, relying on reasoning that has been rejected by this Court on appeal.)

*Id.* Even when these "credit-as-true" criteria are satisfied, however, district courts in this circuit retain the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.*

### B.    Medical Opinion Evidence

Applying the "credit-as-true" rule here, the Commissioner has acknowledged that the ALJ failed to provide legally sufficient reasons for rejecting evidence. (*See* Def.'s Br. at 3-4, conceding that "the ALJ failed to provide legally sufficient reasons for rejecting evidence," because "the ALJ erred in evaluating evidence in determining that Plaintiff was not disabled.") The Commissioner agrees that the ALJ must reevaluate on remand both Dr. Taubenfeld's and Dr. Beery's opinions. (Def.'s Br. at 9, 11.) Furthermore, the ALJ has already acknowledged that Dr. Taubenfeld's assessment, if credited, would support a finding of disability[11] (Tr. 99), and therefore the ALJ would be required to find Alexander disabled on remand if this Court credits Dr. Taubenfeld's opinion as true.

Thus, the only question left for the Court to answer is whether further administrative proceedings would serve a useful purpose. The Commissioner argues that conflicts in the record preclude the Court from crediting Dr. Taubenfeld's opinion as true. The Court, however, has already concluded that substantial evidence does not support the ALJ's rejection of Dr. Taubenfeld's assessment of mild intellectual disability, the ALJ's observation that Alexander responded well to mental health treatment after being evaluated by Dr. Taubenfeld, or the ALJ's

---

[11] Despite this concession, the ALJ formulated an RFC assessment that supported a finding of nondisability. (Tr. 18, 23, 99.) This inconsistency supports the conclusion that the ALJ implicitly rejected Dr. Taubenfeld's assessment without providing any reasons for doing so. *See Daniell v. Astrue*, 384 F. App'x 798, 802 (10th Cir. 2010) (concluding that the ALJ "implicitly rejected" a portion of the claimant's treating physician's opinion evidence by formulating an inconsistent RFC assessment).

finding that Dr. Taubenfeld's opinion is inconsistent with the record. Indeed, Dr. Taubenfeld's opinion is consistent with the record, including testimony provided by Kincaid, a long-time vocational rehabilitation counselor, and Dr. Beery, a treating physician who spent considerable time observing and assessing Alexander's abilities. The record need not be further developed.

In light of Dr. Taubenfeld's medical opinion, and the record evidence corroborating his opinion, this Court does not have serious doubt about whether Alexander is, in fact, disabled within the meaning of the Social Security Act. Accordingly, the district judge should credit Dr. Taubenfeld's opinion as true, and remand this case for benefits. *See Garrison*, 759 F.3d at 1022 (holding that it would be clear that the ALJ would be required to find the claimant disabled, because such a conclusion followed directly from the court's "analysis of the ALJ's errors and the strength of the improperly discredited evidence").

### C.    Listing 12.05C (Intellectual Disability)

Alexander alternatively urges the Court to find, without further proceedings, that she is presumptively disabled under Listing 12.05C. To establish equivalency under Listing 12.05C, a claimant must show: (1) subaverage intellectual functioning with deficits in adaptive functioning initially manifested before age twenty-two; (2) an IQ score of sixty to seventy; and (3) a physical or other mental impairment causing an additional and significant work-related limitation. *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013); *Stavrakis v. Colvin*, No. 6:12–cv–01929–SI, 2014 WL 1584494, at *4 (D. Or. Apr. 21, 2014) (same).

The Commissioner disputes only the first element, arguing that Alexander has failed to show subaverage intellectual functioning with deficits in adaptive functioning initially manifested before age twenty-two. (*See* Def.'s Br. at 4-7.) Before addressing the Commissioner's arguments, the Court finds that the second and third elements are satisfied. The ALJ's step two severity finding satisfies Listing 12.05C's requirement of an impairment causing an additional

and significant work-related limitation. *See Narron v. Colvin*, No. 6:14–cv–00923–SI, 2015 WL 4663388, at *4 (D. Or. Aug. 5, 2015) ("The ALJ's finding at step two that Mr. Narron had severe impairments . . . satisfies Listing 12.05C's requirement of an impairment imposing an additional work-related limitation."). Alexander received a full-scale IQ score of sixty-six on the Wechsler Adult Intelligence Scale, Fourth Edition, battery of tests.[12] (Tr. 1888.) Accordingly, the second element is satisfied because the ALJ did not question the validity of these test results. *See Lewis v. Astrue*, No. 06-6608, 2008 WL 191415, at *4 (N.D. Cal. Jan. 22, 2008) ("Here, the ALJ did not explicitly reject the validity of claimant's . . . IQ score, so the Court must accept the score as valid.").

    As to the first element, the Commissioner argues that Dr. Taubenfeld's "testing . . . does not support the onset of an impairment before age" twenty-two. (Def.'s Br. at 6.) The Ninth Circuit has not addressed the issue, but judges in this district have held that "a valid adult IQ score can be reflective of an impairment that manifested during the claimant's developmental period." *Brooks v. Astrue*, No. 11–1252–SI, 2012 WL 4739533, at *5-6 (D. Or. Oct. 3, 2012); *see also Canales v. Astrue*, 10-01200-HZ, 2011 WL 4704228, at *7 (D. Or. Oct. 4, 2011) (noting that an individual's IQ is "presumed to remain stable over time") (citation omitted). Consistent with the foregoing authorities, the Court concludes that Alexander's valid full-scale IQ score of sixty-six is competent evidence demonstrating subaverage general intellectual functioning during the developmental period. *See Brooks*, 2012 WL 4739533, at *7 (making a similar observation based on "competent test scores").

---

[12] Alexander also received a verbal comprehension score of seventy. (Tr. 1888.) "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with 12.05." *Stavrakis*, 2014 WL 1584494, at *6 (citation, footnote, and brackets omitted).

The remaining question, then, is whether Alexander has established that she had "deficits in adaptive functioning" during that same period." *See id.* "The Diagnostic [and] Statistical Manual of Mental Disorders describes 'adaptive functioning' as how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socioeconomic background, and community setting." *Id.* It is well-settled that "a claimant may use circumstantial evidence to demonstrate adaptive functioning deficits, such as attendance in special education classes, dropping out of high school prior to graduation, difficulties in reading, writing or math, and low skilled work history." *Id.* (citation, quotation, and brackets omitted).

The Commissioner disputes whether Alexander has demonstrated that she had deficits in adaptive functioning before the age of twenty-two, noting that Alexander graduated from high school, was not enrolled in special education classes, attended some college, had "successful" past work in semi-skilled positions (e.g., one year as a vault teller and ten months as a gambling cashier), and maintained employment "at or near" the substantial gainful activity level for several years. (Def.'s Br. at 6.) The Commissioner also states that she has obtained a copy of Alexander's high school transcript, and asserts that it should be "considered and added" to the record on remand. (Def.'s Br. at 7.)

Alexander, on the other hand, argues that the "circumstantial evidence overwhelmingly demonstrates" deficits in adaptive functioning before age twenty-two. (Pl.'s Reply at 5.) As support for her argument, Alexander points out that she has never lived independently, developed complex relationships, had a long-term boyfriend, married, had children, or managed a checkbook; does not socialize with friends; has always struggled to sustain work, been dependent on her family, been considered a slow learner, and struggled academically; failed her

driver's test several times in two states before obtaining a license, and flunked out of college; has been laid off several times due to performance issues; and made several attempts at working only because her parents pushed her to do so. (Pl.'s Reply at 4.)

It is not clear from this record whether Alexander suffered from deficits in adaptive functioning before the age of twenty-two. In *Stavrakis*, the record indicated that the claimant was born with neurological defects due to complications during birth, began receiving Social Security benefits when he was nine years old and stopped receiving them when he was incarcerated in his adult years, was enrolled in special education classes throughout primary and secondary school, dropped out of school in the ninth grade, failed to earn his General Equivalency Degree due to deficits in basic reading and writing, received a full-scale IQ score of sixty-eight, had a low-skilled work history, received low scores on reading and math tests, and repeatedly reported struggling with reading and writing over a twenty-year period. 2014 WL 1584494, at *5-6. The Stavrakis court nonetheless concluded that the ALJ, who had not addressed Listing 12.05C in his decision, was "in a better position" to weigh the record evidence and make a determination regarding equivalency. *Id.* at *4.

So too here. The parties have cited evidence that both supports and potentially detracts from a finding that Alexander experienced deficits in adaptive functioning before the age of twenty-two. When presented with such a scenario, the appropriate response is to defer to the ALJ for a weighing of the evidence. *See id.* That is especially true when one considers the amount of persuasive circumstantial evidence that was before the *Stavrakis* court. The record before this Court is far less developed. Accordingly, the Court cannot conclude on this record that Alexander meets or equals listing 12.05C.

PAGE 26 – FINDINGS AND RECOMMENDATION

**CONCLUSION**

For the foregoing reasons, the Court recommends that the district judge GRANT in part and DENY in part the Commissioner's motion to remand (ECF No. 18), and remand this case for an award of benefits.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 5th  day of January, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge